IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARVIN QUINN, | : | |
|     Plaintiff | : | No. 1:24-cv-01856 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| LOVE'S TRAVEL STOPS & | : | |
| COUNTY STORES, INC., | : | |
|     Defendant | : | |

**MEMORANDUM**

Before the Court is Defendant Love's Travel Stops & County Stores, Inc. ("Defendant")'s motion to compel arbitration and stay proceedings. (Doc. No. 7.) For the reasons that follow, the Court will deny Defendant's motion and permit arbitration-related discovery.

**I.    BACKGROUND**[1]

Plaintiff is an African American man who was hired by Defendant on January 26, 2020. (Doc. No. 1 ¶¶ 2, 20.) Within approximately one (1) year, Plaintiff was promoted to Truck Care General Manager and began working in Defendant's store located at 3555 Vine Street, Londonberry, Pennsylvania. (Id. ¶ 22.) While working at the Londonberry store, Plaintiff was the only black employee in the Truck Care Department and the only black employee who reported to General Store Manager Christopher Brown ("Brown"). (Id. ¶¶ 24, 26–27.) At the Londonberry store, Plaintiff was treated "differently and worse [than white employees], and in a more hostile and dismissive manner" such as: (1) his performance was criticized; (2) he was blamed for issues out of his control; (3) he was told that Defendant was going to get rid of him; and (4) "[s]ubordinate employees would bypass Plaintiff in his supervisory role and instead go

---

[1] These facts are drawn from Plaintiff's complaint. (Doc. No. 1.)

directly to other white superiors." (Id. ¶ 28.) Plaintiff complained of race discrimination to Brown and Brown's supervisor District Manager Patrick Chappelle ("Chappelle"). (Id. ¶¶ 24, 29.)

Around early June 2021, during a meeting with Brown and Chappelle, Plaintiff was demoted from Truck General Manager to Truck Care Customer Service Manager and transferred to Defendant's store located at 1165 Harrisburg Pike, Carlisle, Pennsylvania. (Id. ¶ 32.) Plaintiff complained of race discrimination in connection with the demotion and transfer to another store. (Id. ¶ 34.) After his demotion and transfer, Plaintiff took a medical leave of absence due to the race discrimination he had experienced around early June 2021. (Id. ¶ 35.) Plaintiff returned from his medical leave of absence on or about June 28, 2021. (Id. ¶ 36.) At Defendant's Carlisle store, Plaintiff reported to General Store Manager Art Sperritt ("Sperritt"), who reported to District Manager Bill Stanton ("Stanton"). (Id. ¶ 37.) Plaintiff was the only black employee reporting to Sperritt and the only black employee in the Truck Care Department at Defendant's Carlisle store. (Id. ¶¶ 39–41.) While at the Carlisle Store, Plaintiff was treated "differently and worse [than white employees], and in a more hostile and dismissive manner" such as: (1) "[s]ubordinate white employees refused to follow Plaintiff's instructions"; (2) "[s]upervisory white employees told Plaintiff that he was not allowed to discipline employees who were subordinate to him, despite subordinate employees refusing to follow[] his instructions"; (3) Plaintiff was told that employees complained about him; (4) Plaintiff was unjustly accused of being aggressive; and (5) Plaintiff was blamed for issues out of his control. (Id. ¶ 42.) Plaintiff complained to Sperritt and Stanton of race discrimination in connection with his treatment. (Id. ¶ 43.)

On or about September 7, 2021, Plaintiff found cut-up watermelon on a desk that he used for work. (Id. ¶ 44.) "Plaintiff understood the above conduct to be race[]based" and took a photograph of the cut-up watermelon. (Id. ¶¶ 45, 46.) On or about the same day, Plaintiff showed the cut-up watermelon to Overnight Tire Worker "Sam L/N/U" and asked who put it on his desk. (Id. ¶ 47.) In response, Overnight Tire Worker Sam laughed at the watermelon and Plaintiff's question. (Id. ¶ 48.) Plaintiff also showed the cut-up watermelon and complained of racism to Operations Manager Jeremy Turnbull ("Turnbull"), who told Plaintiff that he would tell Sperritt about it. (Id. ¶¶ 49, 50.) On the same day, Plaintiff also complained of race discrimination to Sperritt in connection with the cut-up watermelon on his desk. (Id. ¶ 51.) Sperritt told Plaintiff that he would "get to the bottom of it." (Id. ¶ 52.) Plaintiff also complained of race discrimination in connection with his treatment at the Carlisle store to District Truck Care Manager Dean Graham ("Graham"). (Id. ¶ 53.) Graham told Plaintiff that the watermelon looked like something someone had for lunch but that he would look into the issue. (Id. ¶ 54.)

On or about September 16, 2021, Tire Technician Wyatt Interieri ("Interieri") yelled at Plaintiff and referred to him as a "motherf[***]ing n[***]er" in front of other employees. (Id. ¶ 57.) That same day, during a meeting with Sperritt and Turnbull, Plaintiff's employment was terminated effective immediately. (Id. ¶ 58.) "[Sperritt and Turnbull] stated that someone had made a complaint to corporate that Plaintiff was acting aggressive[ly]." (Id. ¶ 59.) Although they asked Plaintiff what happened with Interieri, Sperritt cut Plaintiff off while Plaintiff attempted to tell his side of the story and stated that he and Turnbull had decided to terminate Plaintiff's employment after speaking with Stanton. (Id. ¶ 60.) "The stated reason for the above was that Defendant could not have people making complaints to corporate." (Id. ¶ 61.)

On September 16, 2021, after the termination of his employment, Plaintiff informed Graham that he had been terminated during a telephone call. (Id. ¶ 62.) Graham informed Plaintiff that he had not known of his termination. (Id. ¶ 63.) Plaintiff complained to Graham that Interieri had yelled at him and referred to him as a "motherf[***]ing n[***]er." (Id. ¶ 64.) Graham told Plaintiff that the Interieri situation was unfortunate and that Plaintiff should not have been terminated. (Id. ¶ 65.) Plaintiff also had a telephone call with Stanton on September 16, 2021, during which he asked why he was terminated. (Id. ¶ 66.) Stanton responded "that it was not going to work out." (Id. ¶ 67.)

On September 17, 2021, Plaintiff emailed Divisional Director Tony Cribb ("Cribb") regarding his termination, sent a photograph of the cut-up watermelon that was on his desk, and stated that he had reported the watermelon incident but received no response. (Id. ¶ 68.) Cribb replied with the following: "Please note, I am in tune with this entire situation. Given the circumstances and facts that I assisted on researching. Your termination will stand in place. The allegations you have made were not known. These will be investigated and handled accordingly. I wish you well for any future endeavors." (Id. ¶ 69.) Plaintiff complained to Cribb of racism at Defendant's stores and that his complaints had been ignored. (Id. ¶ 70.)

During a telephone call with an unknown female individual from Defendant's Human Resources team on or around September 20, 2021, Plaintiff was informed that she had spoken with Stanton and that Plaintiff's termination would stand. (Id. ¶ 71.) Plaintiff asked why he had not been contacted for his side of the story, but no one responded. (Id. ¶¶ 72, 73.) On or about September 22, 2021, during a telephone call with an unknown male individual from Defendant's Human Resources team, Plaintiff was informed that Defendant was "sorry about the way his

situation was handled and that Defendant would have a Divisional Director look into what happened." (Id. ¶ 74.)

On October 28, 2024, after having received no further communication from Defendant, Plaintiff initiated the above-captioned action. (Id.) Plaintiff alleges that Defendant violated Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), as amended, 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act (the "PHRA"), as amended, 43 Pa. C.S.A. § 951 et seq. (Id. at 1.) Plaintiff seeks economic damages, compensatory damages, punitive damages, as well as attorneys' fees and costs. (Id.) Plaintiff attached three exhibits to his complaint: a civil cover sheet, a complaint that he submitted to the Pennsylvania Human Relations Commission ("PHRC"), and a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC"). (Doc. Nos. 1-1 through 1-3.)

On January 6, 2025, Defendant filed a motion to compel arbitration and stay proceedings (Doc. No. 7) along with a brief in support (Doc. No. 8) and four exhibits ("Exhibits A, A-1, A-2, and A-3") (Doc. No. 7-1 (containing all four exhibits)). Exhibit A is an affidavit signed and sworn by Keith Varner, who is a Manager of Leader Development for Defendant, stating that Defendant implemented a mandatory alternative dispute resolution program with mandatory arbitration in the Fall of 2020 and distributed a "Mutual Dispute Resolution Agreement" and a "How We Resolve Disputes" document to all employees between October 2020 and March 2021. (Doc. No. 7-1 at 2–3.) Exhibit A also states that employees were prompted through an employee portal to agree or disagree to those documents with a pop up stating: "I confirm that I have read and understand all the material contained in this document link." (Id. at 3.) An employee could also close out of the pop up window. (Id.) It further states that Defendant keeps

5

track of employees who acknowledged the agreement via the portal, and Plaintiff reviewed and agreed to the agreement on May 8, 2021, according to Defendant's records. (Id.) Exhibit A-1 is the "Mutual Dispute Resolution Agreement," and Exhibit A-2 is the "How We Resolve Disputes" document. (Doc. No. 7-1 at 5–11.) Exhibit A-3 is an image of the "Mutual Dispute Resolution Agreement" with the pop up asking for the reader to "agree" or "disagree" with the statement, "I confirm that I have read and understand all the material contained in this document link." (Id. at 12–13.)

Plaintiff filed a brief in opposition along with a declaration ("Exhibit 1") on February 7, 2025. (Doc. Nos. 13, 13-1.) Plaintiff's declaration states that he has no recollection of "ever seeing, reading, or being presented with the Mutual Dispute Resolution Agreement [] or the How We Resolve Disputes" document. (Doc. No. 13-1 at 2.) The declaration further states that Plaintiff has "no recollection of any employee from Defendant ever mentioning or discussing the need to review or acknowledge the Mutual Dispute Resolution Agreement [] or the How We Resolve Disputes" document and "no recollection of ever acknowledging or agreeing to the Mutual Dispute Resolution Agreement [] or the How We Resolve Disputes" document. (Id. at 3.) Defendant filed a reply brief on February 21, 2025. (Doc. No. 14.) Thus, Defendant's motion is ripe for resolution.

**II.    LEGAL STANDARD**

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, provides the "body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes" and expresses a "strong federal policy in favor of resolving disputes through arbitration." See Century Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 522 (3d Cir. 2009). However, arbitration is "strictly a matter of contract." See Bel-Ray Co. v. Chemrite (Pty)

Ltd., 181 F.3d 435, 444 (3d Cir. 1999).  "If a party has not agreed to arbitrate, the courts have no authority to mandate that he do so."  Id.  "Thus, in deciding whether a party may be compelled to arbitrate under the FAA, we first consider '(1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement.'"  Flintkote Co. v. Aviva PLC, 769 F.3d 215, 220 (3d Cir. 2014) (quoting Century Indem., 584 F.3d at 527).

As to the first question, the United States Court of Appeals for the Third Circuit ("Third Circuit") has recently reiterated that there are "two distinct paths for district courts to follow" when determining whether an agreement to arbitrate was reached.  See Young v. Experian Info. Sols., Inc., 119 F.4th 314, 319 (3d Cir. 2024) (citing Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 772–76 (3d Cir. 2013)).  The two paths are the Federal Rule of Civil Procedure 12(b)(6) standard or the Rule 56 standard.  See Guidotti, 716 F.3d at 772; accord Young, 119 F.4th at 319.  The Rule 12(b)(6) standard is appropriate where "it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause.'"  See Guidotti, 716 F.3d at 776 (quoting Somerset Consulting, LLC v. United Cap. Lenders, LLC, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)).  In such cases, a court may "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  See id. at 772 (quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)).

In contrast, the Rule 56 standard is appropriate: (1) where "the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity to establish on its face that the parties agreed to arbitrate," or (2) where "the opposing party has come forth with

7

reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement, even though on the face of the pleadings it appears that it did." See id. at 774; accord Young, 119 F.4th at 319.  In such cases, the district court may allow limited discovery on the question of arbitrability before entertaining the motion to compel arbitration under a summary judgment standard.  See Young, 119 F.4th at 319 (citations omitted).  However, "discovery is not required 'when no factual dispute exists as to the existence or scope of the arbitration agreement.'"  See Cornelius v. CVS Pharmacy Inc., 133 F.4th 240, 249 (3d Cir. 2025) (quoting Young, 119 F.4th at 320).

### III. DISCUSSION

As explained supra, courts must first determine which legal standard applies to the motion to compel arbitration before determining arbitrability, scope, and whether arbitration related discovery is appropriate.  See Young, 119 F.4th at 319.  Accordingly, the Court presents the arguments of the parties before addressing which legal standard applies to Defendant's motion to compel arbitration and stay proceedings.

#### A. Arguments of the Parties

Defendant argues that Plaintiff's claims are governed by the arbitration agreement that it attached as Exhibit A-1 to its motion.  (Doc. Nos. 8 at 3; 7-1 at 5–9.)  Defendant further asserts that Plaintiff's claims of discrimination, retaliation, and hostile work environment under Title VII, Section 1981, and the PHRA are all covered by the arbitration agreement.  (Doc. No. 8 at 3.)  Defendant maintains that the arbitration agreement is valid and cannot be invalidated because Plaintiff cannot demonstrate fraud, duress, or unconscionability.  (Id.)  Moreover, Defendant argues that an arbitrator must determine the arbitrability of claims pursuant to the arbitration agreement and that it has not waived its rights to invoke the arbitration agreement.  (Id. at 3–4.)

In response, Plaintiff contends that Defendant fails to provide sufficient evidence demonstrating his "understanding or acknowledgement of any arbitration documents" in violation of Rule 56. (Doc. No. 13 at 8.) Plaintiff asserts that, although Exhibit A states that Defendant distributed copies of its arbitration policies beginning in October 2020 and ending in March 2021, Exhibit A-1 and Exhibit A-2 are not dated or signed. (Id. at 9.) Therefore, Plaintiff argues that the provision in paragraph five (5) of Exhibit A, stating that the agreements were distributed to all employees by March 2021, is inadmissible. (Id.) Plaintiff also maintains that Exhibit A's statement that Defendant's records indicate that Plaintiff reviewed and agreed to the two agreements on the afternoon of May 8, 2021, is unsupported by any documentation in the record. (Id. at 9–10.) Therefore, Plaintiff requests that the Court deem paragraph nine (9) of Exhibit A inadmissible as well. (Id. at 10.)

Plaintiff next argues that, even if the Court credited Exhibit A, Defendant's motion should be denied because it fails to show the existence of any enforceable arbitration agreement. (Id.) Plaintiff first asserts that there is no evidence to suggest that he was informed of the arbitration agreement documents, the date he was informed of the documents, or how the agreements were distributed to him. (Id. at 10–11.) Second, Plaintiff points to Exhibit A's statement that Defendant's employees were able to agree, disagree, or close out of the document entirely, which would not register an employee's assent or dissent to the agreement. (Id. at 11.) Plaintiff notes that closing out of the document does not demonstrate that Plaintiff, or any other employee, reviewed the documents. (Id.) Plaintiff notes that "those options are inconsistent with" other cases involving Defendant as a party, and in which Defendant has moved to compel arbitration, have shown electronic signatures rather than click-to-agree buttons. (Id.) Third, Plaintiff maintains that Exhibit A-1 and Exhibit A-3 are not the same document as evinced by the

inclusion of the word "exhibit 1" in the first line of Exhibit A-3. (Id. at 12–13.) Fourth, Plaintiff notes that Exhibit A's assertion that Plaintiff reviewed and agreed to the arbitration agreement is unsupported by any evidence of record. (Id. at 13.) Indeed, Plaintiff contends in his own declaration submitted in opposition to Defendant's motion (Doc. No. 13-3), that he does not recall signing, acknowledging, reviewing, or seeing the agreements before Defendant filed its motion. (Id. ¶¶ 4–7; Doc. No. 13 at 13.) Therefore, Plaintiff argues that Defendant cannot establish a meeting of the minds regarding arbitration. (Doc. No. 13 at 13.) Lastly, Plaintiff asserts alternatively that, if the Court does not conclude outright that Defendant's motion to compel arbitration should be denied, he should be permitted to obtain limited discovery regarding arbitrability. (Id. at 14.)

### B.     Which Legal Standard Applies to the Motion to Compel Arbitration

Upon consideration of the complaint, the attached exhibits, and the applicable law, the Court finds that the Rule 12(b)(6) standard is inapplicable here where Plaintiff's complaint does not reference an arbitration agreement, and no agreement is attached as an exhibit to his complaint. See (Doc. No. 1).[2] Defendant's motion to compel includes multiple exhibits such as: the arbitration agreement; an affidavit attesting to Defendant's records that purport to evidence Plaintiff's agreement to arbitrate; a company policy document that discusses arbitration as the means of dispute resolution; and an image of a click-to-agree pop up window. Plaintiff's response includes a declaration asserting that he has no recollection of signing the arbitration agreement and noting that Defendant's Exhibits A-1 and A-2 both lack signatures and dates. Accordingly, the Court concludes that, because the evidence is inconclusive on the issue of

---

[2] Indeed, the only exhibits Plaintiff attached to his complaint were a civil cover sheet (Doc. No. 1-1), his complaint to the PHRC (Doc. No. 1-2), and his right-to-sue letter from the EEOC (Doc. No. 1-3). None of those exhibits mention an arbitration agreement.

arbitrability, the Rule 56 standard applies. As noted, under such circumstances, limited discovery is warranted before the Court can resolve Defendant's motion where, as here, the evidence is insufficient for the Court to determine whether there has been a meeting of the minds on the agreement to arbitrate. See Young, 119 F.4th at 320 (finding that fact discovery is warranted when "the record was insufficient for the district court to make th[e] threshold determination [of whether a meeting of the minds occurred on the agreement to arbitrate] before compelling arbitration"). Accordingly, the Court will deny Defendant's motion to compel arbitration.[3] The parties are entitled to discovery on the question of whether the parties agreed to arbitrate.[4] See id.; see also Guidotti, 716 F.3d at 777, 779.

## IV.  CONCLUSION

For the foregoing reasons, the Court will deny Defendant's motion to compel arbitration and permit arbitration-related discovery. An appropriate Order follows.

---

[3] Although Defendant asserts that the arbitration agreement delegates questions of arbitrability to the arbitrator, because the issue at hand concerns whether there was a meeting of the minds, the Court must resolve that question. See Cornelius, 133 F.4th at 250 n.13 (citing Young, 119 F.4th at 321) ("Although the arbitration agreement delegates to the arbitrator threshold questions regarding the validity and enforceability of the Arbitration Policy, questions regarding the formation of the arbitration agreement must be resolved in federal court.").

[4] In addressing how the district courts should resolve a factual dispute on whether the parties agreed to arbitration, the Third Circuit has directed: "[A] restricted inquiry into factual issues will be necessary to properly evaluate whether there was a meeting of the minds on the agreement to arbitrate, and the non-movant must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity of the arbitration agreement." See Guidotti, 716 F.3d at 774 (internal citations and quotations omitted); accord Young, 119 F.4th at 319–20.