**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARVIN QUINN,** | : | |
| **Plaintiff** | : | **No. 1:24-cv-1856** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **LOVE'S TRAVEL STOPS &** | : | |
| **COUNTRY STORES, INC.,** | : | |
| **Defendant** | | |

**MEMORANDUM**

Before the Court is Defendant Love's Travel Stops & Country Stores, Inc. ("Defendant")'s renewed motion to compel arbitration and stay proceedings. (Doc. No. 17.) For the following reasons, the Court will grant the motion.

## I. BACKGROUND

### A. Factual Background[1]

Plaintiff Marvin Quinn ("Plaintiff") is an African American man who was hired by Defendant on January 26, 2020. (Doc. No. 1 ¶¶ 2, 20.) Within approximately one (1) year of his hiring date, Plaintiff was promoted to Truck Care General Manager and began working in Defendant's store located at 3555 Vine Street, Londonberry, Pennsylvania. (Id. ¶ 22.) Plaintiff was the only black employee in the Truck Care Department at the Londonberry store, and the only black employee that reported to General Store Manager Christopher Brown ("Brown"). (Id. ¶¶ 24, 26–27.) While working at the Londonberry store, Plaintiff was treated "differently and worse [than white employees], and in a more hostile and dismissive manner" such as: (1) his performance was criticized; (2) he was blamed for issues out of his control; (3) he was told that Defendant was going to get rid of him; and (4) "[s]ubordinate employees would bypass [him] in

[1] The facts included in this section are drawn from Plaintiff's complaint. (Doc. No. 1.)

his supervisory role and instead go directly to other white superiors." (Id. ¶ 28.) Plaintiff complained of race discrimination to Brown and Brown's supervisor District Manager Patrick Chappelle ("Chappelle") on numerous occasions. (Id. ¶¶ 24, 29.)

Around early June 2021, during a meeting with Brown and Chappelle, Plaintiff was demoted from Truck General Manager to Truck Care Customer Service Manager and transferred to Defendant's store located at 1165 Harrisburg Pike, Carlisle, Pennsylvania. (Id. ¶ 32.) Plaintiff complained of race discrimination in connection with the demotion and transfer to another store. (Id. ¶ 34.) Following his demotion and transfer, Plaintiff took a medical leave of absence "due to the race discrimination to which he was being subjected." (Id. ¶ 35.) Plaintiff returned from his medical leave of absence on or about June 28, 2021. (Id. ¶ 36.) At Defendant's Carlisle store, Plaintiff reported to General Store Manager Art Sperritt ("Sperritt"), who in turn reported to District Manager Bill Stanton ("Stanton"). (Id. ¶ 37.) Plaintiff was the only black employee reporting to Sperritt and the only black employee in the Truck Care Department at Defendant's Carlisle store. (Id. ¶¶ 39–41.) While working at the Carlisle Store, Plaintiff was treated "differently and worse [than white employees], and in a more hostile and dismissive manner" such as: (1) "[s]ubordinate white employees refused to follow Plaintiff's instructions"; (2) "[s]upervisory white employees told Plaintiff that he was not allowed to discipline employees who were subordinate to him, despite subordinate employees refusing to follow[] his instructions"; (3) Plaintiff was told that employees complained about him; (4) Plaintiff was unjustly accused of being aggressive; and (5) Plaintiff was blamed for issues out of his control. (Id. ¶ 42.) Plaintiff complained to Sperritt and Stanton of race discrimination in connection with his treatment. (Id. ¶ 43.)

On or about September 7, 2021, Plaintiff found cut-up watermelon on a desk that he used

for work. (Id. ¶ 44.) "Plaintiff understood the above conduct to be race[]based" and took a photograph of the cut-up watermelon. (Id. ¶¶ 45, 46.) On or about the same day, Plaintiff showed the cut-up watermelon to Overnight Tire Worker "Sam L/N/U" and asked who put it on his desk. (Id. ¶ 47.) In response, Overnight Tire Worker Sam laughed at the watermelon and Plaintiff's question. (Id. ¶ 48.) Plaintiff also showed the cut-up watermelon and complained of racism to Operations Manager Jeremy Turnbull ("Turnbull"), who told Plaintiff that he would tell Sperritt about it. (Id. ¶¶ 49, 50.) On the same day, Plaintiff also complained of race discrimination to Sperritt in connection with the cut-up watermelon on his desk. (Id. ¶ 51.) Sperritt told Plaintiff that he would "get to the bottom of it." (Id. ¶ 52.) Plaintiff also complained of race discrimination in connection with his treatment at the Carlisle store to District Truck Care Manager Dean Graham ("Graham"). (Id. ¶ 53.) Graham told Plaintiff that the watermelon looked like something someone had for lunch but that he would look into the issue. (Id. ¶ 54.)

On or about September 16, 2021, Tire Technician Wyatt Interieri ("Interieri") yelled at Plaintiff and referred to him as a "motherf[***]ing n[***]er" in front of other employees. (Id. ¶ 57.) That same day, during a meeting with Sperritt and Turnbull, Plaintiff's employment was terminated effective immediately. (Id. ¶ 58.) "[Sperritt and Turnbull] stated that someone had made a complaint to corporate that Plaintiff was acting aggressive[ly]." (Id. ¶ 59.) Although they asked Plaintiff what happened with Interieri, Sperritt cut Plaintiff off while Plaintiff attempted to tell his side of the story and stated that he and Turnbull had decided to terminate Plaintiff's employment after speaking with Stanton. (Id. ¶ 60.) "The stated reason for the above was that Defendant could not have people making complaints to corporate." (Id. ¶ 61.)

On September 16, 2021, after the termination of his employment, Plaintiff informed

Graham that he had been terminated during a telephone call. (Id. ¶ 62.) Graham informed Plaintiff that he had not known of his termination. (Id. ¶ 63.) Plaintiff complained to Graham that Interieri had yelled at him and referred to him as a "motherf[***]ing n[***]er." (Id. ¶ 64.) Graham told Plaintiff that the situation with Interieri was unfortunate and that Plaintiff should not have been terminated. (Id. ¶ 65.) Plaintiff also had a telephone call with Stanton on September 16, 2021, during which he asked why he was terminated. (Id. ¶ 66.) Stanton responded "that it was not going to work out." (Id. ¶ 67.)

On September 17, 2021, Plaintiff emailed Divisional Director Tony Cribb ("Cribb") regarding his termination, sent a photograph of the cut-up watermelon that was on his desk, and stated that he had reported the watermelon incident but received no response. (Id. ¶ 68.) Cribb replied with the following: "Please note, I am in tune with this entire situation. Given the circumstances and facts that I assisted on researching. Your termination will stand in place. The allegations you have made were not known. These will be investigated and handled accordingly. I wish you well for any future endeavors." (Id. ¶ 69.) Plaintiff complained to Cribb of racism at Defendant's stores and that his complaints had been ignored. (Id. ¶ 70.)

On or around September 20, 2021, an unknown woman from Defendant's Human Resources team informed Plaintiff during a telephone call that she had spoken with Stanton and that Plaintiff's termination would stand. (Id. ¶ 71.) Plaintiff asked why he had not been contacted for his side of the story, but he did not receive an answer. (Id. ¶¶ 72, 73.) On or about September 22, 2021, an unknown man from Defendant's Human Resources team stated to Plaintiff during a telephone call that he was "sorry about the way his situation was handled and that Defendant would have a Divisional Director look into what happened." (Id. ¶ 74.) Plaintiff received no further communication from Defendant. (Id. ¶ 75.)

### B. Procedural Background

On October 28, 2024, Plaintiff filed the complaint that initiated this action, asserting that Defendant violated Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), as amended, 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act (the "PHRA"), as amended, 43 Pa. C.S.A. § 951 et seq. (Id. at 1.) On January 6, 2025, Defendant filed a motion to compel arbitration and stay proceedings (Doc. No. 7) along with a brief in support (Doc. No. 8) and four exhibits (Exhibits A, A-1, A-2, and A-3) (Doc. No. 7-1 (containing all four exhibits)). Exhibit A is an affidavit signed and sworn by Keith Varner ("Varner"), who is a Manager of Leader Development for Defendant, stating that Defendant implemented a mandatory alternative dispute resolution program with mandatory arbitration in the Fall of 2020 and distributed a "Mutual Dispute Resolution Agreement" ("MDRA") and a "How We Resolve Disputes" ("Acknowledgment") document to all employees between October 2020 and March 2021. (Doc. No. 7-1 at 2–3.) Exhibit A also states that employees were prompted through an employee portal to agree or disagree to those documents with a pop-up stating: "I confirm that I have read and understand all the material contained in this document link." (Id. at 3.) An employee could also close out of the pop-up window. (Id.) Exhibit A further states that Defendant keeps track of employees who acknowledged the agreement via the portal, and that Plaintiff reviewed and agreed to the agreement on May 8, 2021, according to Defendant's records. (Id.) Exhibit A-1 is the MDRA and Exhibit A-2 is the Acknowledgment. (Id. at 5–11.) Exhibit A-3 is an image of the MDRA with the pop-up ("MDRA Pop-Up") asking for the reader to "agree" or "disagree" with the statement, "I confirm that I have read and understand all the material contained in this document link." (Id. at 12–13.)

Plaintiff filed a brief in opposition to Defendant's motion to compel arbitration, along with a declaration (Exhibit 1) ("Declaration") on February 7, 2025. (Doc. Nos. 13, 13-1.) The Declaration states that Plaintiff has no recollection of "ever seeing, reading, or being presented with the Mutual Dispute Resolution Agreement [] or the How We Resolve Disputes" document. (Doc. No. 13-1 at 2.) The Declaration further states that Plaintiff has "no recollection of any employee from Defendant ever mentioning or discussing the need to review or acknowledge the Mutual Dispute Resolution Agreement [] or the How We Resolve Disputes" document and "no recollection of ever acknowledging or agreeing to the Mutual Dispute Resolution Agreement [] or the How We Resolve Disputes" document. (Id. at 3.) Defendant filed a reply brief on February 21, 2025. (Doc. No. 14.)

On September 4, 2025, the Court issued a Memorandum and Order denying Defendant's motion to compel arbitration and stay proceedings without prejudice to its ability to refile the motion. (Doc. Nos. 15–16.) The Court noted that the motion would be resolved pursuant to the summary judgment procedure set forth in Federal Rule of Civil Procedure 56 after the parties engaged in a period of arbitration-related discovery. (Id.)

On October 30, 2025, after the parties completed a period of arbitration-related discovery, Defendant filed a renewed motion to compel arbitration and stay proceedings (Doc. No. 17), along with a brief in support (Doc. No. 18) and five exhibits (Exhibits A, B, C, D, and E) (Doc. Nos. 17-3 through 17-7). Exhibit A consists of selected portions of Varner's deposition transcript; Exhibit B is Plaintiff's "learning transcript";[2] Exhibit C is the MDRA; Exhibit D is the MDRA Pop-Up; and Exhibit E is Plaintiff's Declaration. (Doc. Nos. 17-3 through 17-7.) On

[2] A description of this document and its contents is included infra in the Discussion section of this Memorandum.

November 24, 2025, after receiving an extension of time, Plaintiff filed a brief in opposition to Defendant's renewed motion to compel arbitration (Doc. No. 21) and nine exhibits (Exhibits A, B, C, D, E, F, G, H, and I) (Doc. Nos. 21-2 through 21-10). Exhibit A consists of Defendant's objections, answers, and responses to Plaintiff's first set of interrogatories and document requests; Exhibit B is Varner's deposition transcript in its entirety; Exhibit C is Defendant's motion to compel arbitration and stay further proceedings, brief in support thereof, and various exhibits and attachments filed in Yearley v. Love's Country Store # 285 et al., No. 1:23-cv-00922 (D.N.M. February 5, 2024), ECF No. 18; Exhibit D is Plaintiff's learning transcript; Exhibit E is a screenshot of the learning transcript's metadata; Exhibit F is Defendant's motion to compel arbitration and stay proceedings and supporting exhibits filed in Henderson v. Love's Travel Stop & Country Stores, Inc., No. 1:22-cv-00059 (M.D. Pa. March 14, 2022), ECF No. 5; Exhibit G is Defendant's motion to compel arbitration and stay further proceedings, brief in support thereof, and various supporting exhibits filed in Phillips v. Love's Travel Stops and Country Stores Inc., No. 1:23-cv-00593 (W.D. Mich. July 12, 2023), ECF No. 12; Exhibit H is an unpublished opinion in Rearick v. Clearwater 2008 Note Program, LLC, No. 15-cv-02265, 2017 WL 2362484 (M.D. Pa. May 31, 2017); and Exhibit I is an unpublished opinion in Fong v. U.S. Bancorp, No. 22-cv-01291, 2025 WL 721628 (E.D. Cal. March 6, 2025). (Doc. Nos. 21-2 through 21-10.)

On December 8, 2025, Defendant filed a reply brief (Doc. No. 22) and five exhibits (Exhibits A, B, C, D, and E) (Doc. Nos. 22-2 through 22-6). Exhibit A is a document describing the job duties and qualifications for Defendant's "Manager of Leader Development" position; Exhibit B is selected portions of Varner's deposition transcript; Exhibit C is the complaint filed in Henderson; Exhibit D is Defendant's answer and affirmative defenses to the plaintiff's

complaint filed in Phillips, as well as exhibits showing the plaintiff's electronic signature to Defendant's Acknowledgment and MDRA documents; and Exhibit E is a duplicate of Exhibit D. (Doc. Nos. 22-2 through 22-6.) Having been fully briefed, Defendant's renewed motion to compel arbitration is ripe for disposition.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, provides the "body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes" and expresses a "strong federal policy in favor of resolving disputes through arbitration." See Century Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 522 (3d Cir. 2009). However, arbitration is "strictly a matter of contract." See Bel-Ray Co. v. Chemrite (Pty) Ltd., 181 F.3d 435, 444 (3d Cir. 1999). "If a party has not agreed to arbitrate, the courts have no authority to mandate that he do so." Id. "Thus, in deciding whether a party may be compelled to arbitrate under the FAA, we first consider '(1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement.'" Flintkote Co. v. Aviva PLC, 769 F.3d 215, 220 (3d Cir. 2014) (quoting Century Indem. Co., 584 F.3d at 527).

In deciding a motion to compel arbitration, a court may either employ the motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) or the motion for summary judgment standard under Federal Rule of Civil Procedure 56. See Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 771–76 (3d Cir. 2013). The Third Circuit Court of Appeals has provided the following guidance regarding when each standard applies:

> [W]hen it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay. But if the complaint and its supporting

> documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on the question. After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard.

Id. at 776 (internal quotation marks and citation omitted).

As reflected in the Memorandum accompanying the Court's Order denying Defendant's initial motion to compel arbitration, the Court permitted arbitration-related discovery after concluding that the Rule 12(b)(6) standard was inapplicable here given that "Plaintiff's complaint does not reference an arbitration agreement," and that more evidence was needed to determine whether there was a meeting of the minds between the parties as to an agreement to arbitrate. (Doc. No. 15 at 10–11.) As the window for discovery has ended and Defendant has filed a renewed motion to compel arbitration, the Court now assesses the motion under the Rule 56 standard. See Guidotti, 716 F.3d at 776.

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. See id. at 251–52. In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. See Celotex, 477 U.S. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative. See Anderson, 477 U.S. at 249–50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. See id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Furthermore, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial. See Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III. DISCUSSION

As noted supra, "in deciding whether a party may be compelled to arbitrate under the FAA, we first consider (1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement." See Flintkote Co., 769 F.3d at 220 (internal quotation marks and citation omitted). "Because arbitration is a matter of contract," "[t]o determine whether the parties agreed to

arbitrate, we turn to ordinary state-law principles that govern the formation of contracts." Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009) (internal quotation marks omitted).

Under Pennsylvania law,[3] "contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration." See id. A valid and binding contract can be formed even in the absence of signatures where "the parties have otherwise manifested their mutual asse[n]t to the essential terms" of the contract. See Evans v. Gordon Food Servs., No. 14-cv-01242, 2015 WL 4566817, at *9 (M.D. Pa. July 29, 2015) (citing Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd., 739 A.2d 133, 136 (Pa. 1999) (stating that "[a]s a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties")). "Whether [a] party's actions evince[] assent must be determined on the basis of what a reasonable person in the position of the part[y] would be led to understand by such conduct under all of the surrounding circumstances." Levin v. Prime Communications Inc., 361 A.3d 643, 650 (Pa. Super. Ct. 2026). "The party seeking to compel arbitration bears the burden of proving the parties manifested an assent to be bound by an arbitration agreement." Id. at 649–50.

Defendant argues that its renewed motion to compel arbitration should be granted because record evidence establishes that the MDRA is a valid and enforceable agreement satisfying all three of the elements required for contract formation under Pennsylvania law. (Doc. No. 18 at 6.) With reference to element one, Defendant states that by March 2021, all of its existing employees, including Plaintiff, had access to the MDRA on Travel Stop, its employee

---

[3] The parties appear to agree that Pennsylvania law applies to the instant matter, as both cite Pennsylvania contract law throughout their briefs. See (Doc. Nos. 18, 21).

portal. (Id. at 2.) Defendant asserts that it is able to track an employee's access and use of Travel Stop and, specifically, that its Learning Management System Team ("LMS Team") can populate a "learning transcript" for any individual employee. (Id.) A "learning transcript reflects the subject employee's completion of training and execution of documents on Travel Stop," and according to Defendant, its "LMS Team is unable to alter an employee's learning transcript." (Id.) Defendant asserts that Plaintiff's learning transcript—filed as Exhibit B to Defendant's motion (Doc. No. 17-4)—reflects that Plaintiff logged into his Travel Stop profile on May 8, 2021, and "completed the MDRA and the Acknowledgment and watched the MDRA video at 1:43 a.m., 1:49 a.m., and 1:50 a.m., respectively" (Doc. No. 18 at 3). Specifically, Defendant claims that "[t]he 'Yes' in the 'Completion' [c]olumn of Plaintiff's [l]earning [t]ranscript indicates that he clicked 'agree' to the MDRA." (Id.) "If Plaintiff had instead clicked 'disagree' or exited out of the MDRA before clicking 'agree' or 'disagree,' his [l]earning [t]ranscript would not have recorded a 'Yes' in the 'Completion' [c]olumn." (Id.)

Based on the above, Defendant argues that "Plaintiff manifested an intent to be bound by the MDRA" by clicking "agree" to its terms, and that Plaintiff's inability to remember doing so "is insufficient to create a question of fact as to whether [he] executed the MRDA." (Id. at 8–9.) In support of its argument, Defendant contends that "[c]ourts in the Third Circuit have routinely found [that] an employee expressly assents to be bound by the terms of an arbitration agreement when [the] employee clicks 'agree.'" (Id. at 7 (citing Bonilla v. Adecco USA, Inc., No. 23-cv-02741, 2024 WL 945310, at *5 (E.D. Pa. Mar. 5, 2024) and Keller v. Pfizer, Inc., No. 17-cv-01883, 2018 WL 5841865, at *3 (M.D. Pa. Nov. 8, 2018)).) Defendant finds Bonilla particularly instructive, arguing that the plaintiff in that case also disputed her agreement to an arbitration agreement based on a lack of recollection, but that the court nevertheless found that "the

defendant's business records showing the time stamps of when [the] plaintiff viewed and electronically signed the forms," combined with "the safeguards used to protect the documents from being completed by anyone other than [the] plaintiff," "created no question of fact as to whether [the] plaintiff agreed to [the arbitration agreement's] terms." (Id. at 8 (citing Bonilla, 2024 WL 945310 at *2–3, *5).)

As to element two, Defendant argues that the terms of the MDRA are sufficiently definite because it details the scope of covered claims, who determines arbitrability, and that the FAA governs. (Id. at 10.) Defendant further argues, with respect to element three, that Plaintiff's continued employment following his execution of the MDRA, along with the mutually binding terms of the MDRA, serves as adequate consideration supporting its enforcement. (Id. at 9–10.)

In response, Plaintiff argues that Defendant's renewed motion to compel arbitration should be denied because it is predicated on inadmissible documents and hearsay. (Doc. No. 21 at 9.) Specifically, Plaintiff contends that the learning transcript produced by Defendant lacks trustworthiness because it is a document "created for the purpose of litigation," and that its metadata reflects that it was last modified by an attorney within Defendant's risk management department "years after its original was downloaded, and just days before Varner's deposition took place." (Id. at 10.) Plaintiff additionally contends that Varner did not have personal knowledge of whether Plaintiff clicked "agree" to the MDRA's terms, and that he only assumed that clicking agree would show up as a "Yes" under the "Complete" section of his learning transcript based on "hearsay" provided by another employee days before his deposition. (Id. at 11–12.) As such, Plaintiff concludes that there is "no admissible evidence to suggest there was mutual meeting of the minds," and, accordingly, Defendant cannot meet its summary judgment burden. (Id. at 12.)

Plaintiff further argues that, even if the evidence Defendant supplies is admissible, multiple disputes of material fact exist precluding summary judgment on the issue of contract formation. (Id. at 13.) Namely, Plaintiff asserts that: (1) "Defendant has not provided admissible evidence showing [that he] undisputedly clicked the 'Agree' button"; (2) he "himself has set forth sufficient evidence to suggest that he d[oes] not recall signing or acknowledging the MDRA . . . and that regardless, he never agreed . . . to be bound by [its] terms"; (3) the timing and order in which his learning transcript shows the MDRA materials being completed is "facially impossible", as it reflects that he completed the materials out of the order that Varner described in a sworn affidavit in another case, and that he agreed to the four page MDRA in less than six seconds; and (4) Varner was unable to explain why, in other cases, Defendant produced a DocuSign copy of the MDRA bearing an electronic signature but did not do so here. (Id. at 13–14.) Lastly, Plaintiff argues that even if Defendant could prove mutual assent, "continued employment alone (without 'new' and valuable consideration) is insufficient consideration under Pennsylvania law for existing at-will employees." (Id. at 15.)

Upon careful consideration of Defendant's motion, the arguments of the parties, the record in this case and relevant authority, the Court will grant Defendant's renewed motion to compel arbitration, as it concludes that Defendant has provided sufficient, admissible evidence to show that there is no genuine dispute of material fact as to whether a valid arbitration agreement exists between the parties. Because the Court finds that the MDRA is a valid agreement to arbitrate, and Plaintiff does not contest that his dispute falls within its scope or otherwise object to its delegation clause,[4] the Court need not determine whether the dispute in question falls

[4] Section five of the MDRA provides that "the arbitrator shall have the exclusive authority to resolve any dispute relating to the arbitrability of any individual claim[.]" (Doc. No. 17-5 at 3.)

within the scope of the MDRA. See Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 69 (2019) (stating that "if a valid [arbitration] agreement exists, and . . . the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue"); Petrel v. Saber Healthcare Holdings, LLC, No. 24-cv-00765, 2025 WL 1333531, at *4 (W.D. Pa. May 7, 2025) (stating that "if the party opposing arbitration does not challenge the delegation provision specifically, 'the district must treat it as valid and must enforce it by sending any challenge to the validity of the underlying arbitration agreement to the arbitrator'") (quoting MZM Constr. Co., Inc. v. N.J. Bldg. Laborers Statewide Benefit Funds, 974 F.3d 386, 399 (3d Cir. 2020)); Eichlin v. GHK Co., 746 F. Supp. 3d 247, 251 (E.D. Pa. 2024) (noting that "when an arbitration provision, by clear and unmistakable evidence, contains a valid delegation clause, the court's inquiry is limited to the first step: determining whether a valid agreement to arbitrate exists") (internal quotation marks and citation omitted). Further, because Plaintiff does not dispute that the terms of the MDRA are sufficiently definite, the Court will limit its analysis to elements one and three of contract formation under Pennsylvania law.

With regard to element one, Defendant demonstrates Plaintiff's assent to the MDRA by producing Plaintiff's learning transcript, which, combined with Varner's testimony regarding Defendant's business practices and system processes, reflects that Plaintiff reviewed the MDRA on May 8, 2021, at or around 1:43 a.m. (Doc. No. 17-4 at 5.) Although Defendant did not produce a copy of the MDRA bearing Plaintiff's signature, its failure to do so is not fatal to its ability to demonstrate Plaintiff's assent to its terms because a reasonable person in Plaintiff's position would understand, based on the language included in the MDRA, that by clicking "agree" and/or continuing their employment with Defendant after receipt and acknowledgment

of the MDRA, they would be manifesting their intent to be bound by its terms.[5] See Levin, 361 A.3d at 650 (stating that "[w]hether [a] party's actions evince[] assent must be determined on the basis of what a reasonable person in the position of the part[y] would be led to understand by such conduct under all of the surrounding circumstances" ) (internal quotation marks and citation omitted); Bracy v. Macy's Retail Holdings, Inc., No. 19-cv-03825, 2020 WL 1953647, at *5 (E.D. Pa. Apr. 23, 2020) (stating that "numerous courts in this district have held that an employer's distribution of an arbitration policy to existing at-will employees—as part of an employee handbook or as a freestanding document—constitutes an offer of continued employment, subject to the terms of the arbitration program") (collecting cases); Keller, 2018 WL 5841865 at *3 (noting that, "[i]n the specific context of assent to arbitration clauses, courts have found [] intent where a plaintiff agreed in a digital format that did not require a signature, electronic or otherwise"); Wetzel v. Baldwin Hardware Corp., No. 98-cv-03257, 1999 WL 54563, at *3 (E.D. Pa. Jan. 29, 1999) (finding that the plaintiff's continued employment constituted acceptance of the defendant's arbitration and mediation policy because the "policy explicitly [stated] that continued employment indicates acceptance").

Contrary to Plaintiff's assertions, the Court finds that Defendant does not rely on inadmissible evidence to demonstrate his assent to the MDRA. Specifically, the Court concludes that Plaintiff's learning transcript is not a record created for the purpose of litigation and is instead an admissible business record under Federal Rule of Evidence 803(6). See AAMCO

---

[5] The first page of the MDRA states that the "Agreement is a condition of employment" and that an "[e]mployee [who] accepts or continues employment with the Company . . . will be bound by its terms." (Doc. No. 17-5 at 2.) The last page of the MDRA additionally states, in bolded uppercase text, that "this contract is a binding arbitration agreement" and that "by signing below (or accepting or continuing employment)" the employee "acknowledge[s] that [they] have received and read . . . this arbitration agreement and [] agree[s] to its terms." (Id. at 5.)

Transmissions, Inc. v. Baker, 591 F. Supp. 2d 788, 794 (E.D. Pa. 2008) (noting that records prepared in anticipation of litigation lack the assumption of trustworthiness afforded to Rule 803(6) business records because they "are not made in the ordinary course of [an entity's] business"). Rule 803(6) permits the admission of documents containing otherwise inadmissible hearsay provided that the proponent demonstrates that:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

See Fed. R. Evid. 803(6). A witness "qualified" to testify and lay the foundation for a business record need only "have familiarity with the [corresponding entity's] record-keeping system and the ability to attest to the foundational requirements of Rule 803(6)." See United States v. Console, 13 F.3d 641, 657 (3d Cir. 1993) (stating that "the term 'other qualified witness' should be construed broadly, and that a qualified witness need not be an employee of the record-keeping entity so long as he understands the system") (cleaned up).

Here, Defendant establishes: Varner's adequate familiarity with Defendant's Learning Management System,[6] the online system that electronically stores and records the data reflected in learning transcripts (Doc. Nos. 22 at 6; 21-3 (Varner deposition testimony) at 4–5), as Varner

[6] Varner testified that Defendant's Learning Management System is a portion of its employee portal, which is generally referred to as Talent Stop. (Doc. No. 21-3 at 7.)

testifies to having almost eight years of experience using the system (Doc. No. 21-3 at 7); that it is part of his job role to interact and work with the employees who directly manage the system (id. at 18, 22); that he regularly reviews reports generated from that system (id. at 19); and that he has an understanding of how those reports are interpreted (id. at 11, 12, 26). Defendant has demonstrated that Varner is qualified to lay the foundation for the admission of Plaintiff's learning transcript as a business record under Rule 803(6), and does so through his testimony asserting that Defendant regularly maintains learning transcripts as a means of documenting what trainings an employee has completed or what documents they have executed; that they can be generated at any time and reflect information current to the date that they are requested; and that Plaintiff's learning transcript in particular was downloaded (i.e., not created) by Learning Management Specialist, Colin Wright.[7] (Id. at 9, 10, 19, 20.) Further, Varner developed the personal knowledge required to competently testify about Plaintiff's learning transcript by virtue of his role and experience within Defendant's company, his consultation with Learning Management specialist Samanatha Mills, and his personal review of Plaintiff's learning transcript. See (Doc. No. 21-3 at 4, 26); Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); Klosterman v. Discover Prods. Inc., 752 F. Supp. 3d 470, 476–77

---

[7] The Court notes that Plaintiff's learning transcript was downloaded by Defendant in the form of an excel spreadsheet. (Doc. No. 21-3 at 4, 10.) Although Plaintiff insinuates that the metadata of the spreadsheet (Doc. No. 21-6)—which reflects that the spreadsheet was last modified by Larry Dixon, an attorney within Defendant's Risk Management department—provides reason to doubt the trustworthiness of the document (Doc. No. 21 at 11), the Court is unpersuaded. Because the metadata, as shown, does not demonstrate that the contents of the spreadsheet were altered to misrepresent the data or information recorded on Defendant's Learning Management System, the Court cannot conclude, without more, that "the method or circumstances of Defendant's] preparation [of Plaintiff's learning transcript] indicate a lack of trustworthiness." See Fed. R. Evid. 803(6)(E).

(E.D. Pa. 2024) (stating that "[t]he Third Circuit has found a witness's personal examination of records introduced at trial sufficient to satisfy the personal knowledge requirement of Rule 602 . . . and [that] several lower courts have determined that a witness gains the requisite personal knowledge by reviewing business records—including those records of which he did not have any prior, specific knowledge").

As Defendant has provided admissible evidence demonstrating that Plaintiff reviewed and agreed to the MDRA—in part by continuing his employment with Defendant well after he executed the MDRA—the Court accordingly finds that Defendant has satisfied its "burden of proving th[at] [Plaintiff] manifested an assent to be bound by [the] [MDRA]." See Levin, 361 A.3d at 649–50. The Court reaches this conclusion notwithstanding Plaintiff's argument that he has "set forth sufficient evidence to suggest that he d[oes] not recall [reviewing,] signing[,] or acknowledging the MDRA" (Doc. No. 21 at 13), as his purported lack of recollection is insufficient to raise a genuine dispute of material fact as to whether he assented to the MDRA. See Barnes v. Festival Fun Parks, LLC, No. 22-cv-00165, 2023 WL 4209745, at *5 (W.D. Pa. June 27, 2023) (concluding that the plaintiff's assertions that she had no recollection of ever seeing, signing, or otherwise executing any documents concerning arbitration "do not amount to an unequivocal denial that the agreement was made and, therefore, are naked assertions insufficient to place in issue the question of assent, or amount to a genuine dispute of material fact"); Gomez v. Rent-A-Ctr., Inc., No. 18-cv-01528, 2018 WL 3377172, at *3 (D.N.J. July 10, 2018) ("With respect to contractual disputes, federal courts have consistently held that a party's

failure to recall a relevant event is insufficient to raise an issue as to the occurrence of that event.").[8]

Lastly, the Court finds, with respect to element three, that Plaintiff's continued employment following his receipt and review of the MDRA, combined with its mutually binding terms,[9] constitutes adequate consideration for the agreement. See Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002) (stating, in regard to an arbitration agreement containing mutually binding terms, that "[w]hen both parties have agreed to be bound by arbitration, adequate consideration exists and the arbitration agreement should be enforced"); Doe 1 Darden Restaurants, Inc., No. 20-cv-00862, 2022 WL 265949, at *10 (M.D. Pa. Jan. 27, 2022) (finding that Crump v. MetaSource Acquisitions, LLC, 373 F. Supp. 3d 540, 547–49 (E.D. Pa. 2019), which concluded that continued employment, standing alone, does not serve as adequate consideration for an arbitration agreement imposed on existing employees, "appears to stand as an outlier on this score and is inconsistent with caselaw within the district and circuit"); Bracy, 2020 WL 1953647 at *7 (noting that, "[u]nder Pennsylvania law, continued employment after receiving notice of an arbitration policy is sufficient to establish acceptance of, as well as consideration for, an arbitration agreement"); Alexander v. Raymours Furniture Co., No. 13-cv-

[8] Plaintiff's arguments regarding the "facial impossibility" of the timing and order of completion of the MDRA materials also fail to raise a genuine dispute of material fact as to the issue of contract formation. Varner testified that although there is a logically intended sequence of completion of the MDRA materials, Defendant's system does not restrict employees from reviewing and completing them in any order they choose. (Doc. No. 21-3 at 29.) Moreover, the fact that Plaintiff's learning transcript reflects that he completed the four-page MDRA in less than six seconds does not negate his assent to it or otherwise render it unenforceable. See AT&T Mobility Services, LLC v. Boyd, No. 19-cv-02539, 2020 WL 6203831, at *12 (N.D. Ohio Oct. 22, 2020) (finding the employee's six-second review of the arbitration agreement before clicking the "review completed" button irrelevant to whether he accepted the agreement).

[9] Section I of the MDRA states that "[i]f Employee accepts or continues employment with the Company, both Employee and the Company will be bound by its terms." (Doc. No. 17-5 at 2.)

05387, 2014 WL 3952944, at *5 (E.D. Pa. Aug. 13, 2014) (rejecting plaintiff's argument that continued employment, alone, is insufficient consideration for "post-hiring arbitration agreements," and noting that "[n]umerous courts in this district have held that continued employment fulfills the consideration requirement [for an arbitration agreement] under Pennsylvania law") (internal quotation marks and citation omitted).

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's renewed motion to compel arbitration and stay proceedings. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania